**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 14-4388**

———————

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JOHN WATSON, JR.,

        Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:13-cr-00336-TSE-IDD-1)

———————

Argued: December 11, 2014          Decided: July 17, 2015

———————

Before TRAXLER, Chief Judge, and WYNN and HARRIS, Circuit Judges.

———————

Reversed by published opinion. Judge Harris wrote the majority opinion, in which Judge Wynn joined. Chief Judge Traxler wrote a dissenting opinion.

———————

**ARGUED:** Nicholas John Xenakis, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Julia K. Martinez, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Kenneth P. Troccoli, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

PAMELA HARRIS, Circuit Judge:

Following his arrest for firing a handgun at a Coast Guard helicopter, appellant John Watson, Jr. ("Watson"), who suffers from Delusional Disorder, Persecutory Type, was found incompetent to stand trial and committed to the custody of the Attorney General for mental health treatment and evaluation. After Watson refused to take antipsychotic medication in order to render himself competent, the district court granted the government's request that he be medicated by force. Given the critical liberty interests at stake, we require the government to meet a heavy burden to justify forcible medication, and we require courts to conduct a searching inquiry in order to ensure that this burden is met. In this case, we conclude, the government has not met its burden of proving that involuntary medication is substantially likely to restore Watson's competency, as required by Sell v. United States, 539 U.S. 166 (2003). Accordingly, we reverse.

## I.

"The forcible injection of medication into a nonconsenting person's body . . . represents a substantial interference with that person's liberty." Riggins v. Nevada, 504 U.S. 127, 134 (1992) (quoting Washington v. Harper, 494 U.S. 210, 229 (1990)). The interference is "particularly severe" when, as in this case,

2

the medication in question is an antipsychotic, Riggins, 504 U.S. at 134, for the use of such medications threatens an individual's "mental, as well as physical, integrity," United States v. White, 620 F.3d 401, 422 (4th Cir. 2010) (Keenan, J., concurring). On the physical side, there is the "violence inherent in forcible medication," id., compounded when it comes to antipsychotics by the possibility of "serious, even fatal, side effects," Harper, 494 U.S. at 229. But it is the invasion into a person's mental state that truly distinguishes antipsychotics, a class of medications expressly intended "to alter the will and the mind of the subject." United States v. Bush, 585 F.3d 806, 813 (4th Cir. 2009) (quoting Harper, 494 U.S. at 238 (Stevens, J., concurring in part and dissenting in part)).

For those reasons, as we have recognized, the forcible administration of antipsychotic medication "constitutes a deprivation of liberty in the most literal and fundamental sense," Bush, 585 F.3d at 813 (quoting Harper, 494 U.S. at 238 (Stevens, J., concurring in part and dissenting in part)), justified only by a government interest that rises to the level of "essential" or "overriding," Sell v. United States, 539 U.S. 166, 178-79 (2003) (quoting Riggins, 504 U.S. at 134, 135). The government's interest in prison safety and security, the Supreme Court held in Harper, qualifies as such an interest, and may

3

justify involuntary medication when an inmate suffering from a "serious mental illness" is "dangerous to himself or others," and "the treatment is in [his] medical interest." 494 U.S. at 227.

Under certain circumstances, a mentally ill defendant who is not dangerous to himself or others within the meaning of Harper may nevertheless be forcibly medicated for the sole purpose of rendering him competent to stand trial. See Sell, 539 U.S. at 179. But that is the exception, not the rule. Forcible medication is not justified every time an incompetent defendant refuses treatment; on the contrary, "those instances may be rare." Id. at 180. As we have emphasized, forcible medication under Sell is "a tool that must not be casually deployed," and courts must be vigilant to ensure that such orders, which "carry an unsavory pedigree," do not become "routine." United States v. Chatmon, 718 F.3d 369, 373-74 (4th Cir. 2013).

To "minimize[] the risk of erroneous decisions in this important context," we have set a deliberately high standard for the government to satisfy before it may forcibly medicate solely to render an inmate competent to stand trial. Bush, 585 F.3d at 814. Like other courts of appeals to consider the issue, we require that the government meet its burden by the "clear and convincing" standard. Id.; see, e.g., United States v. Dillon,

4

738 F.3d 284, 292 (D.C. Cir. 2013) ("Holding the government to a clear and convincing standard of proof affords due regard to the nature of the liberty interest at stake in forced-medication cases."); United States v. Green, 532 F.3d 538, 545 (6th Cir. 2008) (applying clear and convincing standard); United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004) (same). That is a heavy burden, requiring "evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established," or "evidence that proves the facts at issue to be highly probable." United States v. Heyer, 740 F.3d 284, 292 (4th Cir. 2014) (quoting Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001)).

In this context, we require that the government prove by clear and convincing evidence each of four factors. "First, the government must show that 'important governmental interests are at stake' and that special circumstances do not sufficiently mitigate those interests." White, 620 F.3d at 410 (quoting Sell, 539 U.S. at 180). Second, the government must show that "involuntary medication . . . significantly further[s] [its] interests," which requires proof that the medication is "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to

5

assist counsel at trial." Id. (quoting Sell, 539 U.S. at 181) (internal quotation marks omitted). "Third, the involuntary medication must be necessary to further the government's interests, and less intrusive means must be unlikely to achieve substantially the same results." Id. (citing Sell, 539 U.S. at 181). Fourth and finally, "the court must conclude that the administration of drugs is medically appropriate and in the patient's best medical interests in light of [his] medical condition." Id. (citing Sell, 539 U.S. at 181). With this demanding standard in mind, we now consider whether the district court properly found that forcible medication is justified in this case. United States v. Watson, No. 1:13-cr-366, 2014 WL 1901256, at *1 (E.D. Va. Apr. 29, 2014).

## II.

### A.

On September 28, 2012, Watson was observed shooting a handgun at a Coast Guard helicopter flying overhead. The helicopter was not damaged, and none of the three Coast Guard employees on board was injured. On August 15, 2013, Watson was indicted for attempted destruction of an aircraft, 18 U.S.C. § 32(a)(1), (8); possession of a firearm by a felon, 18 U.S.C. § 922(g)(1); and use of a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A).

Days after Watson's arrest, the magistrate judge granted the parties' joint motion for a competency hearing, and Watson was interviewed by licensed clinical psychologist Dr. Rebecca J. Peterson ("Peterson"). Watson told Peterson that he had been a covert operative for the British special forces since he was seven years old, that the Coast Guard and Secret Service were among the government agencies "working to help protect him from danger and . . . guide him," that certain "entities . . . ha[d] 'tapped' his phones and computer," and "that someone ha[d] been on his boat going through his letters and papers." Watson further indicated that this delusional system of beliefs had been guiding his behavior since at least February 2009, when he arrived in the Washington, D.C., area in order to seek the protection of the British Embassy and was referred to St. Elizabeth's Hospital ("St. Elizabeth's") for mental health treatment.

On the basis of this interview, Peterson concluded that Watson was "unable to participate meaningfully and effectively in his defense" as a result of his delusions, and in particular his belief that his status as a covert operative for the United Kingdom entitles him to diplomatic immunity. The magistrate judge agreed, and Watson was transferred to the Federal Medical Center in Butner, North Carolina ("FMC Butner") for mental health evaluation and treatment.

Approximately six months later, on April 4, 2013, the government submitted to the court a report completed by FMC Butner staff psychiatrist Dr. Robert G. Lucking ("Lucking"), which recommended that Watson be forcibly medicated in order to render him competent to stand trial. Because the government relies exclusively on Lucking's opinion to show there is a substantial likelihood that forcible medication would render Watson competent as required by Sell, we review Lucking's report and testimony in some detail.

In his report, Lucking diagnosed Watson with Delusional Disorder, Persecutory Type,[1] a rare mental illness characterized by "the presence of one or more nonbizarre delusions that persist for at least one month."[2] Lucking further reported that Watson's delusions had not been treated with antipsychotic medication at FMC Butner, and that Watson had refused to accept

_____

[1] The experts in this case use the terms "Persecutory Type" and "Paranoid Type" interchangeably. For clarity and consistency with the Diagnostic and Statistical Manual of Mental Disorders, we consistently refer to Watson's condition as "Persecutory Type."

[2] A delusion is "nonbizarre" if it involves a situation that can conceivably occur in real life, such as being followed, poisoned, infected, conspired against — or, as here, being recruited to work as a covert operative for a foreign government. "Bizarre" delusions, by contrast, are clearly implausible, not understandable, and not derived from ordinary life experiences, such as the belief that one's internal organs have been removed and replaced by someone else's organs without leaving a scar or wound.

8

such treatment. Lucking believed Watson to be neither gravely disabled nor a danger to himself or other inmates, as would be required to justify forcible medication under Harper. Nevertheless, he recommended that Watson be forcibly medicated with the antipsychotic risperidone,[3] asserting that "antipsychotic medication is substantially likely to render [Watson] competent to stand trial."

In support of his opinion, Lucking asserted that "there is extensive support in the psychiatric literature that individuals with the diagnosis of a psychotic illness obtain substantial reduction in their psychotic symptoms when treated with antipsychotic medication," and that "a body of evidence" supports the related proposition that such individuals "can be restored to competency when treated with antipsychotic medication." Lucking also asserted that Watson had taken risperidone during his 2009 admission to St. Elizabeth's, from which Lucking drew the "logical inference [that Watson] responded positively to the use" of that drug. However, Lucking admitted that he did not have the medical records from that

---

[3] The experts in this case use the generic name "risperidone" and the brand name "Risperdal" interchangeably. For clarity, we consistently refer to the drug by the generic name "risperidone."

admission, and later testified that he would have recommended risperidone even if Watson had never received it before.

Finally, during a hearing on the government's request for forcible medication, Lucking testified that his past experience as a psychiatrist supported the use of risperidone. Lucking asserted that he had treated approximately ten other patients suffering from Delusional Disorder with antipsychotic medication, and that he "believe[d] all of them" had been restored to competency. Lucking was, however, unable to provide any further information about the ten other patients, explaining that he could "not remember details of patients [he] treated maybe five, six, seven, or eight years ago," and that it would in any event be "inappropriate" to share such "treatment [and] clinical information" in a public forum, "even with the [district court]."

Lucking's opinion regarding the efficacy of involuntary medication was challenged on several grounds by the report of defense expert and licensed psychologist Dr. James H. Hilkey ("Hilkey"). With respect to the academic literature, Hilkey emphasized that "there is little in the literature referencing well controlled, double-blind research studies as to the efficacy of pharmacological treatment of persons suffering from Delusional Disorders." He also pointed out that the studies that do exist have consistently shown the Persecutory Type of

10

the disorder — from which Watson suffers — to be the "most resistant" to treatment.

With respect to Watson in particular, Hilkey opined that "[t]he chronic nature of [Watson's] illness and the fixed, well established nature of his aberrant thoughts" make his condition resistant to treatment, whether pharmacological or psychological. He expressed concern that the involuntary treatment plan did not adequately address Watson's "strongly held beliefs and reported personal experiences with psychotropic medications," including "pronounced fears of death," and opined that "[f]ailure to compassionately address these fears [would] only contribute[] to fears of persecution" and thus aggravate his condition. Finally, Hilkey indicated that it was his "strongly held opinion" that supportive and cognitive behavioral therapy would "increase the likelihood [Watson's] competency could be sufficiently restored," given Watson's apparent "capacity to form a degree of therapeutic alliance," as demonstrated by his trusting relationship with his attorneys.

**B.**

On March 7, 2014, the magistrate judge recommended that Watson be forcibly medicated in order to restore his competency. Watson, 2014 WL 1901256, at *1, *4. The magistrate judge's findings with respect to the first two Sell factors are relevant to Watson's arguments on appeal.

11

With respect to the first Sell factor, the magistrate judge found "that an important government interest is at stake in the prosecution of the defendant," rejecting Watson's argument that that interest was mitigated by "the possibility of an affirmative defense of not guilty by reason of insanity." Id. at *12, *14-15. In reaching this conclusion, the magistrate judge assumed that such a defense could constitute a mitigating special circumstance, but found that Watson had failed to prove that the defense was "likely [to] be successful" because he had not proffered expert testimony to that effect. Id. at *15.

With respect to the second Sell factor, the magistrate judge found that the proposed treatment plan was substantially likely to restore Watson's competency. To reach this conclusion, the magistrate judge relied entirely on Lucking's testimony and report, which, he noted, referenced the academic literature and the experiences of Lucking's other patients with Delusional Disorder. Id. The magistrate judge held that Hilkey's forensic evaluation did not "undermine" Lucking's conclusion, solely on the ground that Hilkey's report nowhere "directly discredit[ed]" Lucking's treatment plan. Id. at *16.

On April 29, 2014, the district court issued a brief order adopting the recommendations and findings of the magistrate judge and granting the government's motion for involuntary medication. Watson, 2014 WL 1901256, at *1, *4. The order has

12

been stayed pending resolution of this appeal. Order, <u>United States v. Watson</u>, No. 1:13-cr-366 (E.D. Va. May 27, 2014), ECF No. 76.

### III.

On appeal, Watson challenges the district court's findings with respect to the first and second prongs of <u>Sell</u>. Because we conclude that the district court clearly erred in finding that the government had met its burden under the second prong of <u>Sell</u> — and in particular, its burden of proving, by clear and convincing evidence, that forcible medication is substantially likely to restore Watson to competence[4] — we do not decide whether a possible insanity defense is a special circumstance that may mitigate the government interest in prosecution, or

---

[4] The dissent objects that this issue is not properly before us, and that Watson's argument on appeal is limited to the district court's failure to order that the government provide supportive therapy in addition to forcible medication. We respectfully disagree. While it is true that Watson emphasizes Hilkey's view that medication "must be combined with supportive therapy in order to be successful," he does so only in support of his ultimate argument: that the only proposed treatment plan actually before the court "will be unsuccessful," and that "the district court's finding otherwise is clear error." Watson Br. 26.

whether the district court otherwise erred in finding that the government met its burden under the first prong of Sell.[5]

**A.**

We have said that the second Sell factor involves factual determinations subject to clear error review, see White, 620 F.3d at 410, and we recognize that our role is not to second-guess a district court's factual findings, see United States v. Francis, 686 F.3d 265, 273 (4th Cir. 2012). We are, however, charged with ensuring that the district court actually makes the necessary findings, and that it makes them pursuant to the proper legal standard — that it asks and answers the right questions — in light of the record as a whole. See Jiminez v. Mary Washington Coll., 57 F.3d 369, 379 (4th Cir. 1995) ("We reverse a factual finding as being clearly erroneous if, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

---

[5] In the decision below, the district court assumed that a possible insanity defense could be considered in the special circumstances analysis under the first prong of Sell, see Watson, 2014 WL 1901256, at *2, as have other courts within this circuit, see, e.g., United States v. Duncan, 968 F. Supp. 2d 753, 765-66 (E.D. Va. 2013); United States v. Rodman, 446 F. Supp. 2d 487, 496-97 (D.S.C. 2006). There is, however, division among the courts of appeals on the question. Compare United States v. Morrison, 415 F.3d 1180, 1186 (10th Cir. 2005) (likely insanity defense diminishes government interest in trial), with United States v. Mikulich, 732 F.3d 692, 699-701 (6th Cir. 2013) (potential insanity defense does not undermine government interest).

14

conviction that a mistake has been committed.'" (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948))). And in this highly sensitive context, governed by the exacting clear and convincing standard, it is especially important that a district court consider and contend with substantial evidence that would undermine the case for forcible medication, and that it ensure that the government's burden actually has been met. See id. (clear error may occur when a district court "disregard[s] substantial evidence that would militate a conclusion contrary to that reached" or otherwise reaches a conclusion "contrary to the clear weight of the evidence considered in light of the entire record"). On the basis of our review of the entire record, we conclude that the district court clearly erred in finding that the government had met its burden of proving, by clear and convincing evidence, that the proposed treatment is substantially likely to restore Watson's competency. We further conclude that on the record before us, that exacting standard cannot be met.

**B.**

Under the second prong of Sell, the government must prove, by clear and convincing evidence, that involuntary medication significantly furthers its interests. See Chatmon, 718 F.3d at 374. And as part of that showing, the government must "demonstrat[e] that the proposed treatment plan, as applied to

15

this particular defendant, is 'substantially likely' to render the defendant competent to stand trial." United States v. Evans, 404 F.3d 227, 242 (4th Cir. 2005) (emphasis in original). Merely showing a proposed treatment to be "generally effective" against the defendant's medical condition is insufficient to meet this burden. Id. at 241-42; see Bush, 585 F.3d at 816 ("[I]n order to satisfy this second factor of the Sell test, the government must not only show that a treatment plan works on a defendant's type of mental disease in general, but that it is likely to work on this defendant in particular.") (emphasis in original); see also United States v. Ruiz-Gaxiola, 623 F.3d 684, 700 (9th Cir. 2010) (finding this burden unmet where the government's "experts rely on generalities and fail to apply their views to [the defendant's] condition with specificity"). Instead, the government must "relate the proposed treatment plan to the individual defendant's particular medical condition," Evans, 404 F.3d at 242, which requires consideration of factors specific to the defendant in question, including not only his medical condition, but also his age and the nature and duration of his delusions, see id. at 241.

What is missing from the proceedings below is any finding assessing the likely success of the government's proposed treatment plan in relation to Watson's particular condition and particular circumstances. The district court did find that

"[t]he record convincingly reflects that the government has satisfied" the second prong of Sell. Watson, 2014 WL 1901256, at *3. But nothing in the district court's decision indicates that it actually considered whether the evidence proffered by the government sufficiently addressed Watson's particular medical situation. Rather, the district court appears to have concluded that the "substantially likely" requirement had been met merely because Lucking testified that it was. See id. (finding that government had shown involuntary medication to be "substantially likely to render the defendant competent to stand trial" because "Lucking . . . testified that the treatment plan he designed for defendant . . . satisfies these requirements"). And if we go behind the district court's order to the magistrate judge's report and recommendation, the result is no better: In adopting Lucking's conclusion, the magistrate judge pointed for support only to Lucking's reliance on the academic literature and his experience with his own patients, see id. at *15, neither of which bears on Watson's particular medical condition or circumstances.

It is critical that in evaluating the government's case for forcible medication under Sell, courts engage in the proper inquiry: not whether a proposed treatment plan is likely to work in general, but whether it is likely to work as applied to a particular defendant. Permitting the government to meet its

17

burden through generalized evidence alone would effectively allow it to prevail in every case involving the same condition or course of treatment. See Evans, 404 F.3d at 241. Because we are obligated to ensure that a given case is "sufficiently exceptional to warrant the extraordinary measure of forcible medication," we cannot permit such deference here. White, 620 F.3d at 413; see also Evans, 404 F.3d at 241.

## c.

In this case, the requirement that the court assess the efficacy of antipsychotics as applied "with specificity" to Watson's circumstances, Ruiz-Gaxiola, 623 F.3d at 700, is more than a formality. The district court's failure to look beyond Lucking's conclusory assertion that the government's burden had been met is problematic precisely because there is a near total absence of evidence in Lucking's report or testimony that "relate[s] the proposed treatment plan to [Watson's] particular medical condition." Evans, 404 F.3d at 242. This is not a case, in other words, where the district court's failure to properly synthesize or distill the evidence is harmless because we can see for ourselves that the government has met its burden under the second Sell prong. On the contrary: There is virtually nothing in Lucking's report or testimony — the entirety of the government's case — that is sufficiently specific to Watson that it could satisfy the government's burden

18

of showing that Watson is substantially likely to be rendered competent by forcible medication, let alone meet the rigorous clear and convincing standard.[6]

Lucking, for example, argues that risperidone is likely to restore Watson's competency because "there is extensive support in the psychiatric literature that individuals with the diagnosis of a psychotic illness obtain substantial reduction in their psychotic symptoms when treated with antipsychotic medication."  In other words, he asserts: (1) antipsychotic medication effectively treats psychotic symptoms; (2) Watson has psychotic symptoms; (3) therefore, antipsychotic medication will effectively treat his psychotic symptoms.  See also J.A. 75 (Lucking testifying that Watson "has a psychotic symptom; therefore, he needs treatment with an antipsychotic").  This is exactly the kind of nonspecific, syllogistic reasoning we deemed insufficient in Evans, see 404 F.3d at 241, and it has not become any more persuasive over time.

---

[6] The dissent takes the position that the only question before us is whether the district court properly synthesized the record evidence, and not whether that evidence supports the district court's holding.  In our view, however, those issues are so closely interrelated in the context of this case that we are justified in addressing them together.  As Watson argues on appeal, the district court's synthesis errors matter precisely because the evidence that the proposed treatment plan will succeed is so thin.

19

The insubstantiality of that reasoning is exacerbated here by the weaknesses in the studies actually cited in Lucking's report. For one thing, many of those studies concern the efficacy of antipsychotics in general, rather than risperidone in particular, against psychotic illness in general, rather than Delusional Disorder in particular. Cf. White, 620 F.3d at 421 (discounting probative value of doctor's "professional experience and expertise," where doctor's "area of expertise [was] schizophrenia, not delusional disorders"). Because they do not address the specifics of either the proposed treatment plan or Watson's condition, these studies cannot satisfy the government's burden of "relat[ing] the proposed treatment plan to the individual defendant's particular medical condition." Evans, 404 F.3d at 242.

Moreover, the cited studies that do specifically address Delusional Disorder are equivocal at best. One study, Lucking reports, finds a positive response to medication in fewer than half of the cases reviewed, while another places the positive response rate at less than 15%. Still another study identifies Watson's particular condition — the Persecutory Type — as having an especially "poor response rate (50% improvement rate with no reported complete recovery)." The one study cited by the government that does unequivocally support the involuntary use of antipsychotic medication to restore the competency of

20

defendants with the Persecutory Type of Delusional Disorder is, by its own terms, vulnerable to "bias[] in favor of finding a positive response to treatment" due to its experimental design. Byron L. Herbel & Hans Stelmach, Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder, 35 J. Am. Acad. Psychiatry L. 47, 58 (2007).

This is not to say that these and other studies mentioned in Lucking's report are of no evidentiary weight at all. They fairly could be understood to provide some evidence that antipsychotic medication may be effective against Delusional Disorder in general. But standing alone, without explanation or analysis applying their findings to Watson as an individual, we do not believe they can provide the requisite clear and convincing proof that the forcible injection of risperidone is substantially likely to succeed in treating Watson's specific persecutory delusions. Cf. Evans, 404 F.3d at 241-42 (finding government report inadequate to prove that proposed treatment plan was "substantially likely" to restore defendant's competency where it stated only that "such medication is the 'primary' way to treat Schizophrenia" and "nowhere addressed" defendant's individual concerns).

Lucking's testimony regarding his past experience treating patients with Delusional Disorder also fails to take account of

21

Watson's particular condition and circumstances. The experiences of <u>similar</u> patients treated with antipsychotics of course could be relevant to Watson specifically — but here, Lucking was unable to provide any information demonstrating that his patients in fact were similarly situated to Watson. There is, for instance, no evidence that they suffered from the same type of Delusional Disorder, that they received the same medication, that the medication was administered involuntarily, or that their delusions were meaningfully similar in nature and persistence. Indeed, Lucking indicated that he was unable to recall <u>any</u> information about these patients, testifying that he could "not remember details of patients [he] treated maybe five, six, seven, or eight years ago," and that it would, in any case, be "inappropriate to share other people's treatment [and] clinical information," "even with the [district court]." But without information relating his patients' experiences to Watson's own circumstances, that data set is just another form of generalized evidence.

Nor do we think this gap can be filled with evidence that is particularized to Watson but goes to an entirely different question: not whether forcible medication is substantially likely to render Watson competent to stand trial, but whether it is substantially unlikely to have side effects that will interfere with his ability to assist counsel. Those are two

22

separate and independent showings, each of which the government must make under Sell's second prong, 539 U.S. at 181, by clear and convincing evidence, see Bush, 585 F.3d at 815; one cannot substitute for the other. And as we have held, both showings must be made "with respect to the particular defendant [the government] seeks to medicate involuntarily," id. at 815-16, with the same "exacting focus on the personal characteristics of the individual defendant and the particular drugs the [g]overnment seeks to administer," id. at 816 (quoting United States v. Baldovinos, 434 F.3d 233, 240 n.5 (4th Cir. 2006)). In this case, however, while the government does provide an individualized analysis of Watson's vulnerability to counterproductive side effects from risperidone, that only highlights its failure to provide comparable individualized analysis of the likelihood that risperidone will actually succeed in rendering Watson competent.

Finally, Lucking himself undermines the one section of his report that purports to explain why risperidone was recommended for Watson in particular. In that section, Lucking asserts that risperidone is likely to be effective because Watson was treated with risperidone during his 2009 admission to St. Elizabeth's. The report itself qualifies this assertion in at least two ways: It admits that Lucking had not reviewed the hospital records from that admission, and also that the mere fact that Watson

23

"was treated and released" by St. Elizabeth's constitutes only "indirect evidence of a positive response to antipsychotic medication." More importantly, the assertion was deprived of significance during an April 30, 2013, hearing on the motion for involuntary medication, when Lucking admitted that he would have recommended risperidone even if he learned that Watson had never taken it before. As Lucking made clear, his recommendation rested not on any individualized assessment of Watson, but on the belief that "antipsychotics are the treatment of choice for psychotic symptoms" — the same nonspecific, syllogistic reasoning we have previously rejected. See Evans, 404 F.3d at 241.

**D.**

We are concerned here not only with the deficiencies in the government's affirmative case for forcible medication, but also with the substantial questions raised about the government's proposed treatment plan by Hilkey — questions never addressed by the magistrate judge or district court. As we have recognized, careful scrutiny by courts of proposed forcible administration of antipsychotics is necessary to minimize the risk of error where such important liberty interests are at stake. See Bush, 585 F.3d at 814. That scrutiny necessarily requires consideration of any substantial and credible evidence that

24

undermines the case for forcible medication. But there is no indication that such consideration occurred here.

The magistrate judge and district court did not examine and then reject the concerns raised by Hilkey in his report, making subsidiary factual determinations to which we would owe the normal deference. Instead, they summarily disregarded Hilkey's report in its entirety, solely because Hilkey failed to state expressly that the proposed treatment plan would not succeed. Watson, 2014 WL 1901256, at *3, *16 ("As the Report and Recommendation correctly notes, defendant's medical expert, Dr. Hilkey, did not state in his report that Dr. Lucking's plan will not succeed."). But it is the government's burden to prove, by clear and convincing evidence, that its proposed treatment plan is "substantially likely to render [Watson] competent to stand trial," White, 620 F.3d at 410 (quoting Sell, 539 U.S. at 181), and not Watson's burden to prove that it is not.

And by perfunctorily disregarding Hilkey's report, the district court here excluded from consideration significant evidence that does indeed call into question whether forcible medication is likely to "succeed" by restoring Watson's competency. For example, Hilkey disputes Lucking's reading of the scientific literature, asserting that "little is known about [Delusional Disorder] compared to other psychotic disorders," and that what research does exist as to Delusional Disorder

25

indicates that individuals suffering from the Persecutory Type are "most resistant" to treatment. Hilkey's objections to the scientific literature on the use of antipsychotic medication to treat Delusional Disorder are particularly concerning in light of Lucking's heavy reliance on this research in his own report and the magistrate judge's second-order reliance on the same research. Yet these concerns are barely acknowledged, let alone adequately addressed, in the district court order.

The decisions below also failed to give adequate consideration to Hilkey's concern that Watson's particular persecutory delusions are especially unlikely to respond to treatment. Hilkey opines that: (1) due to "[t]he chronic nature of [Watson's] illness and the fixed, well established nature of his aberrant thoughts," Watson's condition is likely to be "resistant to change," and (2) without supportive therapy to address Watson's "strongly held beliefs and reported personal experiences with psychotropic medications," which "include pronounced fears of death," involuntary treatment will "only contribute[] to [Watson's] fears of persecution." Those are exactly the kind of individualized concerns that we have said must be addressed by the government in order to meet its burden of proving that the proposed treatment is substantially likely to restore the defendant's competency, see Evans, 404 F.3d at 241 (finding second-factor burden unmet where government

26

"nowhere addressed [the defense expert's] concern that Evans's delusions of governmental conspiracies that ha[d] persisted longer than 40 years [would] resist involuntary medication precisely because the government administers the medication") — and yet they were summarily dismissed by the district court, see Watson, 2014 WL 1901256, at *2-3, *16.

**E.**

In sum, the district court in this case did not undertake the searching and individualized assessment of Watson's likely susceptibility to forcible medication that is required by our case law. It took the government at its word when it argued that the requirements of Sell had been met, without considering whether the government had produced evidence "relat[ing] the proposed treatment plan to the individual defendant's particular medical condition." Evans, 404 F.3d at 242. This failure to apply the proper legal standard exacerbated the district court's apparent failure to consider the concerns raised by Hilkey's report, which did relate to Watson specifically. See Chatmon, 718 F.3d at 376 (finding clear error where the district court failed to "offer some reason why it did not" credit contrary arguments). Perhaps as a result of these errors of synthesis, the district court overlooked the issue lying at the heart of this case: the meagerness of the evidence that forcible treatment is substantially likely to restore Watson's

27

competency, when his particular medical situation is taken into account — especially as evaluated under the requisite clear and convincing standard of proof.

Any one of these problems would raise questions under the clear error standard of review, whether for misapprehension of the relevant legal standard, failure to consider contrary evidence, or reaching a conclusion against the clear weight of the record. See Jiminez, 57 F.3d at 379. In this case, it is enough to say that cumulatively, they leave us with "the definite and firm conviction that a mistake has been committed," Francis, 686 F.3d at 273 (quoting United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012)), in a context where the costs of error are exceedingly high. We therefore hold that the district court clearly erred in finding that the government has met its burden of proving by clear and convincing evidence — i.e., evidence of a sufficient weight to produce a "firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established," Heyer, 740 F.3d at 292 — "that the proposed treatment plan, as applied to this particular defendant, is 'substantially likely' to render the defendant competent to stand trial," Evans, 404 F.3d at 242 (emphasis in original).

We further conclude that this is the rare case in which a remand is inappropriate because "the record permits only one

28

resolution of the factual issue": that this burden cannot be met. Pullman-Standard v. Swint, 456 U.S. 273, 292 (1982); see, e.g., Ruiz-Gaxiola, 623 F.3d at 696 (declining to remand where "[t]here is no explanation that the court could provide on remand and no findings consistent with the record before us that would allow us to conclude that the government has met its burden under the second Sell factor"). In Bush, 585 F.3d at 817, 818, and Evans, 404 F.3d at 242-43, we remanded rather than reversing after finding the record insufficient to support forced medication under Sell. But in those cases, we articulated new legal standards, Bush, 585 F.3d at 817; Evans, 404 F.3d at 241-42, and our remands, at least in part, afforded the parties their first opportunities to present evidence and make arguments under those standards. The standard we apply today, by contrast, was established over ten years ago in Evans, and we believe that the government has had ample opportunity to assemble and defend the evidence necessary to meet it.

Because the government must prove that it has satisfied each of the four Sell prongs before it may forcibly medicate a defendant, we need not reach Watson's remaining arguments to conclude that the government has not justified forcible medication in this case.

**IV.**

Accordingly, the order of the district court is

<u>REVERSED</u>.

TRAXLER, Chief Judge, dissenting:

The district court granted the government's petition to involuntarily medicate John Watson in order to restore his competency to stand trial. The majority reverses that order, concluding that the government's evidence was insufficient to prove that the proposed treatment plan was substantially likely to render Watson competent. In his appeal, however, Watson does not challenge the sufficiency of the government's evidence establishing the necessity of medication. Instead, he argues that the district court erred by not requiring supportive therapy in addition to medication, which Watson contends would increase the likelihood that he would be restored to competency. This court generally does not address issues not raised by the parties, and I believe it inappropriate in this case for the majority to reverse the district court on an issue raised sua sponte, particularly without giving the government notice of the change in issues or an opportunity to address it. If the issue were properly before us, however, I would find the evidence in the record sufficient to support the district court's order.

As to the issues actually raised by Watson, I conclude that, as to one narrow issue, the district court failed to make the necessary findings. However, I believe the proper course in this circumstance is to vacate and remand for additional

31

findings, not simply reverse the district court outright. Accordingly, I respectfully dissent.

I.

When seeking to involuntarily medicate a defendant for the purpose of restoring his competency to stand trial, the government must establish four factors by clear and convincing evidence. See Sell v. United States, 539 U.S. 166, 180-81 (2003); United States v. Bush, 585 F.3d 806, 813-14 (4th Cir. 2009). First, the government must prove that "important governmental interests are at stake" that are not mitigated by "[s]pecial circumstances." Sell, 539 U.S. at 180. Second, the government must establish that forced medication "significantly further[s]" the government's interests because it is "substantially likely to render the defendant competent to stand trial" and "substantially unlikely" to have side effects that would undermine the fairness of a trial. Id. at 181. Third, it must show that forced medication is "necessary to further" the government's interests because "less intrusive means are unlikely to achieve substantially the same results." Id. Fourth, the government must prove that the administration of the requested drug is "medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Id.

To carry its burden under Sell, the government must submit a proposed treatment plan specifying the particular drug and

32

dosage it intends to administer.  See United States v. Evans, 404 F.3d 227, 241 (4th Cir. 2005).  For the treatment plan to satisfy the requirements of the second factor, the government must show that the plan relates

> to the individual defendant's particular medical condition.  In other words, the government, considering all of the particular characteristics of the individual defendant relevant to such a determination, must first show that the treatment plan will significantly further its interests.  It must do so by demonstrating that the proposed treatment plan, as applied to this particular defendant, is substantially likely to render the defendant competent to stand trial and substantially unlikely to produce side effects so significant as to interfere with the defendant's ability to assist counsel in preparing a defense.

Id. at 242 (first emphasis added; footnote and internal quotation marks omitted).

The question posed by the first Sell factor is a legal one, and we therefore review the district court's ultimate answer de novo and any subsidiary factual determinations for clear error.  The remaining three factors pose factual questions subject to clear error review.  See United States v. White, 620 F.3d 401, 410 (4th Cir. 2010).

Clear error, of course, is a very deferential standard.  "A court reviewing for clear error may not reverse a lower court's finding of fact simply because it would have decided the case differently.  Rather, a reviewing court must ask whether, on the entire evidence, it is left with the definite and firm

33

conviction that a mistake has been committed." United States v. Wooden, 693 F.3d 440, 451 (4th Cir. 2012) (internal quotation marks and alteration omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573–74 (1985). "In cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." Helton v. AT & T, Inc., 709 F.3d 343, 350 (4th Cir. 2013).

## II.

Given the fact-bound nature of this appeal, I will first summarize the primary evidence before the district court: the report and testimony of Dr. Robert Lucking, the government's expert witness and staff psychiatrist at the Federal Medical Center in Butner, North Carolina, the facility where Watson is housed; a study by Byron L. Herbel and Hans Stelmach (the "Herbel Study")[1] that was relied upon by Lucking; and the report

---

[1] See Byron L. Herbel & Hans Stelmach, Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder, 35 J. Am. Acad. Psychiatry & L. 47

of Dr. James Hilkey, a psychologist who served as Watson's expert witness.

A.

Dr. Lucking submitted a report detailing his views and testified at the two Sell hearings conducted by the magistrate judge.  In his report, Lucking diagnosed Watson as suffering from delusional disorder, paranoid (or persecutory) type and a "substantial thought disorder."  J.A. 357.  Lucking described the nature of delusional disorder and stated his opinion that Watson was incompetent to stand trial because his "paranoid delusional beliefs" prevented Watson from "understand[ing] the nature and consequences of the proceedings against him" and prevented him from assisting his attorney.  J.A. 359, 360.  Lucking stated his opinion that there was a "substantial probability Mr. Watson's competency can be restored" through treatment with an antipsychotic medication.  J.A. 376.

Lucking explained that antipsychotic medications can restore the competency of those with active psychotic illnesses, and he summarized various studies supporting this general principle.  As to delusional disorder more specifically, Lucking

_____

(2007).  The Herbel Study was submitted to the district court as part of Watson's opposition to the government's petition.

35

noted in his report that "[p]ast opinion of the treatment of delusional disorder with antipsychotic medication was pessimistic. The prevailing opinion was that only a fraction of individuals with delusional disorder would respond to treatment (approximately 10%)." J.A. 371 (emphasis added). Lucking explained, however, that "more recent literature indicates a significantly better response rate," J.A. 372, and he summarized those more recent studies, which included several with rates of successful treatment (i.e., full or partial remission of symptoms)[2] exceeding 75%. Lucking acknowledged that there are "no double-blind placebo-controlled or non-blinded placebo-controlled trials in the literature related to the treatment of delusional disorder," and that the more recent literature involved case studies, which yield "lower quality" evidence than the evidence obtained through placebo-controlled trials. J.A. 372. These shortcomings notwithstanding, Lucking believed the more recent studies "indicate delusional disorder can be treated effectively with antipsychotic medication." J.A. 374.

---

[2] Lucking explained that "it is generally psychotic symptoms which render an individual incompetent," and that "the fewer psychotic symptoms present, and the less intense the symptoms, the more likely that individual is to be competent. Therefore, even a partial response to antipsychotic medication can result in a restoration of competency." J.A. 370.

The report explained the difference between first- and second-generation antipsychotic drugs and noted that second-generation antipsychotics "are considered to be the first line treatment for psychotic conditions due to [their] less onerous side effect profile." J.A. 376. The report discussed the three antipsychotic medications that could be administered involuntarily and noted that risperidone is the only second-generation antipsychotic that could practicably be administered involuntarily. Lucking stated in the report that Watson had previously been admitted to a hospital in Washington, D.C., where he was treated with risperidone. Lucking inferred from the fact that Watson was released from the hospital that he responded positively to the drug, and his treatment plan for Watson recommended the use of risperidone.

Lucking's report stated that treatment with an antipsychotic would not produce side effects that would interfere with Watson's ability to assist his attorney; that Watson had no underlying disease that would preclude the standard treatment of any side effects or make him susceptible to particular side effects; that risperidone would not interact with any of the other medications prescribed for Watson; and that Watson had no "underlying medical illness or conditions which would preclude or be worsened by the use of antipsychotic medication." J.A. 375.

37

In the report, Lucking explained that no less-intrusive treatments were likely to achieve the same results as treatment with risperidone. While acknowledging that psychotherapy can be beneficial as an adjunct to treatment with antipsychotics, Lucking noted that there is "no evidence that psychotherapeutic techniques alone are effective alternatives for treatment with antipsychotic agents." J.A. 375 (emphasis added). Lucking also indicated that therapy would not succeed in this case because Watson does not understand that he has a mental illness, does not believe he needs treatment, and would not participate in any form of therapy.

During the Sell hearings held before the magistrate judge, Lucking testified about the matters set out in his report and reiterated his views that Watson's delusional disorder rendered him incompetent to stand trial and that treatment with an antipsychotic medication was substantially likely to restore Watson's competency. Lucking also testified that he had treated "[o]n an involuntary basis" approximately ten delusional-disorder patients with antipsychotic medication, all of them successfully.[3] J.A. 32. Lucking's testimony also elaborated on

---

[3] The majority questions whether Lucking's testimony establishes that the ten patients were treated involuntarily. In my view, it clearly does. See J.A. 32 ("Q. How many patients suffering from delusional disorder have you treated with antipsychotic medication? A. On an involuntary basis, it's not

the position expressed in the report that therapy would not be helpful for Watson. Lucking explained that because thought disorders and delusions respond positively to antipsychotic medications but are not helped by therapy, he did not believe therapy would be effective to restore Watson's competency to stand trial.

Although Lucking's report recommended risperidone because Watson had previously been treated with it and apparently responded positively to it, Lucking testified at the hearing that he would recommend risperidone even if Watson had never taken the drug. As Lucking explained,

> [t]he reason the risperidone was chosen is because we are very limited. The fact that he had received it before is a fraction of the reason for choosing that medication. That medication is chosen, one, because it's appropriate to treat his delusional disorder; two, the side effects are more tolerable than ones from the 1st generation; the medicine is effective; and I use it a lot, and I get [a] good response [to] it. The fact that he had been on it is not the main reason I chose it for the treatment plan.

J.A. 64-65; see also J.A. 76 ("[C]linically, I believe [risperidone] is the best choice for treatment at this point in time for Mr. Watson.").

---

a lot of them because many of them – it's a rather rare disorder that you don't see very often. So probably somewhere around ten patients over the course of my career here I've treated with antipsychotics." (emphasis added)).

39

Dr. James Hilkey, Watson's expert witness, prepared a report after interviewing Watson for nearly ten hours over the course of four separate interviews. Hilkey agreed that Watson was suffering from delusional disorder, persecutory type, and that Watson was incompetent to stand trial.

Hilkey's report confirmed that Watson had been previously treated with risperidone during an inpatient hospital stay. The hospital records reviewed by Hilkey noted that Watson had an adverse reaction to higher dosages of lithium but mentioned no adverse reaction to the risperidone. Watson, however, told Hilkey that he was "terrified" of the side effects of antipsychotic medications and that he had "severe reactions" to the single dose of risperidone he took under court order. J.A. 381. In Hilkey's view, Watson's fears about the medication "interfaced with his conspiratorial belief system." Id.

As to treatment with antipsychotics, Hilkey stated that "pharmacological treatment of Delusional Disorders [is] less efficacious than with typical psychotic disorder[s] such as Schizophrenia." Id. Hilkey noted the "paucity of controlled, double-blind studies on treatment of individuals with delusional disorders," id., and observed that the "existing studies" show that the persecutory type of the delusional disorder is the most resistant to treatment, J.A. 382.

Hilkey had "some question about the efficacy of pharmacological treatment with Mr. Watson," J.A. 383, noting that "[t]he chronic nature of Mr. Watson's illness and the fixed, well established nature of his aberrant thoughts make response to treatment (pharmacological and psychological) resistant to change," J.A. 383. However, Hilkey never directly stated an opinion on the likely success of the treatment plan proposed by Lucking. Hilkey instead focused on the need for "[s]upportive therapy," which "has been shown to be an effective treatment." J.A. 382. As Hilkey explained,

> [t]he general goals of supportive therapy are to facilitate the treatment adherence and develop a therapeutic alliance, to provide education about the disorder, to improve social skills (i.e. not talking about delusional systems in social places) and to manage behavioral and psychological problems associated with the delusions. This is a slow process; failure to offer this type of supportive treatment in lieu of more aggressive therapy only reinforces the established fears that characterize persecutory delusional disorders.

J.A. 382-83 (footnote omitted). Given Watson's "strongly held beliefs and reported personal experiences with psychotropic medications to include pronounced fears of death," Hilkey believed that "any treatment approach be it pharmacological or psychological must be offered in a supportive manner designed to mitigate the fears of the individual being treated. Failure to compassionately address these fears only contributes to fears of persecution." J.A. 383. In Hilkey's view, Watson's relationship

41

with his attorneys showed his ability to form some degree of the "therapeutic alliance" required for therapy to succeed, and Hilkey "strongly believed" that supportive therapy "could increase the likelihood his competency could be sufficiently restored."  J.A. 384.

C.

The Herbel Study reported findings from an evaluation of the case files of twenty-two men involuntarily medicated at FMC-Butner, the same facility where Watson is housed and Dr. Lucking works.  Of the twenty-two cases studied, sixteen of the patients suffered from delusional disorder, persecutory type; one had delusional disorder, grandiose type; and five were mixed persecutory and grandiose type.  Overall, seventeen of the twenty-two patients (77%) were reported restored to competency. And of the sixteen patients diagnosed with delusional disorder, persecutory type, eleven (69%) were reported restored to competency.  Of the five patients who were not restored to competency, one was mixed type and the other four were persecutory type.

The information reviewed was sufficient in nineteen cases for the authors of the Herbel Study to determine how long before treatment the symptoms had begun.  The symptoms had been present for five years or less for nine patients, seven of whom were restored to competency.  Six patients had had symptoms for seven

42

to ten years, and all six of those patients were restored to competency. Of the four patients who were symptomatic for a much longer period of time (thirteen to twenty-four years), only one was restored to competency.[4]

The study reported that seven patients were restored to competency within six weeks of beginning treatment, but that the other ten who were restored to competency did not shows signs of improvement until undergoing at least three months of continuous treatment, and that some of the patients required five months of treatment before regaining competency. The authors thus recommended treatment trials of at least four months, and noted that many previous studies involved significantly shorter medication trials. In the authors' view, the too-short duration of medication in the previous studies provided a "plausible explanation" for the incorrect "conventional wisdom that these patients are refractory to treatment with antipsychotic medication." J.A. 147; see also J.A. 141 (describing as "empirically unsupported" the opinion asserted in forensic psychiatric literature that "Delusional Disorder is notoriously treatment resistant").

---

[4] The evidence in the record establishes that Watson had been suffering from delusions since 2008 or 2009. Thus, when the district court issued its order in April 2014, Watson had been suffering from the disorder for five to six years.

The authors noted that some experts have expressed concern that patients whose core delusion involves a belief that they are victims of a governmental conspiracy were not likely to respond to forced medication "'precisely because the government administers the medication.'"  J.A. 149 (quoting United States v. Evans, 404 F.3d 227, 241 (4th Cir. 2005)).  As to the twenty-two cases studied, sixteen had delusions of governmental persecution, eleven of whom (65%) were restored to competency; the five patients who were not restored to competency all had such delusions.  In light of that data, the authors concluded that "the presence of delusions involving themes of persecution by the same government that is implementing involuntary medication does not appear to be a useful predictor of nonresponse to treatment."  J.A. 149.

The authors noted that their study was subject to the "usual limitations" inherent in "retrospective inpatient chart review," including the "lack of standardized clinical assessments with rating scales and diagnostic instruments, as well as lack of interrater reliability studies."  Id.  Because of those limitations,

> some patients may have been misdiagnosed and wrongly included or excluded from this study population. Standard research methods to reduce bias, such as random assortment to assigned treatment groups, the use of a placebo control group, and blinded outcome measures, were not possible in this study.  Without these safeguards, the opinions of the forensic

44

examiners may have been biased in favor of finding a positive response to treatment.

J.A. 149–50.  The authors, however, also pointed out a strength of the study:

> [T]he patient cohort was selected in a real-world manner by criminal prosecution, after which they were assessed and involuntarily treated in a real-world manner at a forensic mental health facility.  The main contribution of this study was the <u>observation of treatment response in patients with delusional disorder who, in contrast to the usual protocols in community research studies, were not permitted to drop out of treatment</u>.  That 10 of the 17 patients who responded to treatment required continuous antipsychotic treatment for at least three months, and some up to five months, was unexpected.  This result provides a plausible explanation for the presumed refractory nature of delusional disorder symptoms.  The real obstacle to a positive treatment response in delusional disorder may not be the intrinsic biological features of the illness, but may instead be the difficulties in convincing these patients to adhere to an adequate trial of medication.

J.A. 150 (emphasis added).

### III.

When considering whether the government's proposed treatment plan was "substantially likely to render the defendant competent to stand trial," <u>Sell</u>, 539 U.S. at 181, the district court concluded that Dr. Hilkey strongly recommended supportive therapy but that he never opined that medication alone would not restore Watson's competency.  On appeal, Watson contends that the district court's analysis reflects a clearly erroneous understanding of Hilkey's testimony.  <u>See</u> Brief of Appellant at

45

2 ("[T]he district court clearly err[ed] by misunderstanding the opinion of the defense expert about the necessity of holistic treatment."); id. at 25 ("The district court's misunderstanding of Dr. Hilkey's conclusions constitutes clear error."). Acknowledging that Hilkey never directly stated that the proposed treatment plan would not work, Watson contends that when Hilkey's report is considered in its entirety, its meaning is clear: "Dr. Hilkey does not disagree with Dr. Lucking that Mr. Watson should be medicated. To the contrary, Dr. Hilkey agrees that medication is necessary, but it must be combined with supportive therapy in order to be successful." Brief of Appellant at 24. Watson thus argues the district court clearly erred by misinterpreting Hilkey's report and by not requiring the government to provide supportive therapy as part of the treatment plan.

Rather than focusing on the need for supportive therapy, however, the majority reverses the district court's order after concluding that the government's evidence was insufficiently related to Watson himself and his particular medical condition, and that the government's "generalized" evidence was insufficient to carry its burden of proof under Sell. See Majority Op. at 2 ("[T]he government has not met its burden of proving that involuntary medication is substantially likely to restore Watson's competency . . . ."); id. at 17-18 ("Permitting

46

the government to meet its burden through generalized evidence alone would effectively allow it to prevail in every case involving the same condition or course of treatment.").

A challenge to the overall sufficiency of the evidence, however, is very different from a challenge to the sufficiency of the district court's distillation of the evidence. A challenge to the sufficiency of the evidence asks whether there is any plausible view of the evidence that supports the district court's decision. See Anderson, 470 U.S. at 573-74; United States v. Springer, 715 F.3d 535, 545 (4th Cir. 2013); see also VICI Racing, LLC v. T-Mobile USA, Inc., 763 F.3d 273, 283 (3d Cir. 2014) ("A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." (internal quotation marks omitted)). A challenge to sufficiency of the district court's distillation of the evidence, however, asks whether the district court as factfinder properly "synthesize[d] the evidence in a manner that accounts for conflicting evidence or the gaps in a party's evidentiary presentation." Doe v. Menefee, 391 F.3d 147, 164 (2d Cir. 2004) (Sotomayor, Circuit Judge); accord Miller v. Mercy Hosp., Inc., 720 F.2d 356, 361 (4th Cir. 1983) (explaining that clear error may be found where "the findings under review . . . were made without properly taking into

47

account substantial evidence to the contrary"). An insufficient distillation of the evidence is an error that can be corrected by the district court, through an order on remand that considers all evidence and properly accounts for contrary evidence. Insufficient evidence, by contrast, cannot be corrected by the district court -- insufficient evidence is insufficient, regardless of the thoroughness of the order evaluating it.

In this case, Watson simply does not challenge the sufficiency of the government's evidence. Watson does not argue on appeal that the government's evidence, standing alone, was insufficient to satisfy the Sell requirements, nor does he contend that the government's evidence was not sufficiently individualized to him and his condition. Instead, by arguing that the district court failed to grasp the import of Hilkey's report, Watson is challenging only the district court's synthesis of the evidence, not the existence of the evidence. Indeed, Watson's argument that Hilkey's report establishes the need for medication and supportive therapy effectively concedes that the record contains evidence sufficient to establish that Watson's competency can be restored.

Thus, without acknowledging what it is doing, the majority disregards the argument actually made by Watson and resolves the appeal on an entirely different basis involving an entirely different kind of error -- the government's failure to carry its

burden of proof, rather than the district court's failure to properly synthesize the evidence.[5]  Moreover, by reversing the district court's order without remanding, the majority is granting relief that no one has sought, as Watson does not seek a reversal, but instead asks this court to vacate and remand for further proceedings.[6]

It is well-settled that this court may affirm a district court's order on any basis appearing in the record.  See, e.g., Blum v. Bacon, 457 U.S. 132, 137 n.5 (1982) ("[A]n appellee may rely upon any matter appearing in the record in support of the judgment below."); Scott v. United States, 328 F.3d 132, 137 (4th Cir. 2003) ("We are, of course, entitled to affirm on any ground appearing in the record, including theories not relied

_____

[5] While the majority does note some deficiencies in the district court's order and briefly mentions the cumulative effect of the errors it identifies, the opinion nonetheless makes it clear that the majority is reversing for insufficient evidence.  See Majority Op. at 2 ("In this case, we conclude, the government has not met its burden of proving that involuntary medication is substantially likely to restore Watson's competency."); id. at 25 ("We therefore hold that the district court clearly erred in finding that the government has met its burden of proving, by clear and convincing evidence, . . . that the proposed treatment plan, as applied to this particular defendant, is substantially likely to render the defendant competent to stand trial." (internal quotation marks omitted)).

[6] Although Watson's opening and reply briefs ask us to vacate without mentioning remand, counsel made clear at oral argument that Watson is asking us to vacate the district court's order and remand for further proceedings.

upon or rejected by the district court."). When it comes to reversing a district court's order, however, our discretion is much more constrained. As a general rule, this court does not consider non-jurisdictional issues that are not properly presented in an appellant's opening brief, see, e.g., Suarez-Valenzuela v. Holder, 714 F.3d 241, 248-49 (4th Cir. 2013), much less issues that the appellant never even attempts to raise. While we have the power to address issues not raised by the appellant, see A Helping Hand, LLC v. Baltimore Cnty, 515 F.3d 356, 369 (4th Cir. 2008), we do not exercise that power in civil cases unless the issue "establishes fundamental error or a denial of fundamental justice," In re Under Seal, 749 F.3d 276, 285-86 (4th Cir. 2014) (internal quotation marks omitted).[7]

The majority does not contend that the error it identifies rises to the level of a fundamental error, nor does it otherwise attempt to explain why the facts of this case justify such a departure from our settled practice. This court should not be in the business of re-writing the parties' briefs and raising

---

[7] Of course, "[w]hen an issue or claim is properly before the court," a reviewing court "is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) (emphasis added). This rule has no application in this case because Watson does not challenge the sufficiency of the evidence, and the sufficiency issue thus is not properly before this court.

issues we think they should have raised. Watson does not challenge the sufficiency of the evidence on appeal, and I believe it is improper in this case for the majority to reverse the district court on an issue the majority has raised sua sponte, particularly where the government has been given no notice of the change in the direction of this appeal nor an opportunity to address the issue the majority finds dispositive.

IV.

As discussed above, I do not believe the sufficiency-of-the-evidence question is properly before us. But if it were, I would disagree with the majority's analysis. In my view, the evidence before the district court was sufficient to support the court's factual determination that involuntary medication was "substantially likely to render the defendant competent to stand trial." Sell, 539 U.S. at 181.

A.

In finding the government's evidence insufficient, the majority focuses on our requirement that the government "show that a treatment plan works on a defendant's type of mental disease in general, [and] that it is likely to work on this defendant in particular." Bush, 585 F.3d at 816. To show the appropriate consideration of the defendant "as an individual," Evans, 404 F.3d at 240, the evidence must establish that the experts recommending involuntary medication "actually considered

51

[the defendant's] <u>particular</u> mental and physical condition in reaching [their] conclusions," <u>id.</u>  In my view, Lucking's report, fairly read, is replete with evidence of his consideration of Watson himself and his particular medical condition.

According to the majority, the entirety of Lucking's analysis justifying the proposed treatment plan was that "(1) antipsychotic medication effectively treats psychotic symptoms; (2) Watson has psychotic symptoms; (3) therefore, antipsychotic medication will effectively treat his psychotic symptoms," an analysis the majority rejects as "nonspecific, syllogistic reasoning."  Majority Op. at 19.  I disagree.

While Lucking did note in his report that "there is extensive support in the psychiatric literature that individuals with the diagnosis of a psychotic illness obtain substantial reduction in their psychotic symptoms when treated with antipsychotic medication," J.A. 369, that was not the entirety of his analysis when recommending medication.  Lucking's report discussed delusional disorder in general, but also described how the disorder presented itself in Watson and the nature of Watson's delusions.  Lucking considered the general efficacy of antipsychotic medications on psychotic illnesses generally, but he then went on to consider the efficacy of antipsychotic medications on Watson's specific condition by discussing the

52

limited scientific literature addressing the treatment of delusional disorder, acknowledging studies to the contrary, but noting that the more recent literature shows a high rate of improvement in response to medication. Indeed, as Lucking's report indicates, the Herbel Study shows a high treatment response rate by patients with the persecutory subtype (69% restored to competency) and high response rates by patients whose delusions had persisted for approximately as long as Watson's.[8] Lucking therefore supported his proposed treatment plan with scientific literature involving similarly situated patients suffering from Watson's specific disorder, as we require. See Bush, 585 F.3d at 816 (concluding that Herbel Study did not "relate[] to the particular circumstances" of the defendant with 13-year history of untreated persecutory type of delusional disorder, because Herbel Study showed 25% recovery rate for defendants with "duration of untreated psychosis greater than 13 years"); White, 620 F.3d at 421 (finding Herbel Study to be of "limited assistance" in case involving female defendant suffering from grandiose type of delusional disorder

---

[8] As noted, Watson had been delusional for five or six years prior to the district court's ruling. Nine patients in the Herbel Study had been symptomatic for five years or less, seven of whom (77%) were restored to competency. Six patients been symptomatic for seven to ten years before treatment, all of whom (100%) were restored to competency.

53

because Herbel Study involved male defendants, only one of whom had the grandiose form of the disorder).

In addition, Lucking considered whether Watson was taking medication that would adversely interact with his proposed treatment or had other medical conditions that would place him at special risk for developing the more serious side effects or preclude the standard treatment for managing any side effects. Lucking also considered Watson's beliefs about himself and his illness when concluding that therapy would not be beneficial. Cf. Bush, 585 F.3d at 818 (finding proposed treatment plan inadequate where it recommended medication that can cause diabetes without acknowledging that defendant had diabetes, addressing how the medications would affect his diabetes, or outlining a plan for controlling his condition).

And after considering all the circumstances, Lucking determined, in his expert opinion, that treating Watson with risperidone was substantially likely to restore his competence. As Lucking explained, it was the delusional beliefs that were rendering Watson incompetent, and risperidone

> produces beneficial clinical effects such as decreasing delusional beliefs. . . . By decreasing delusional beliefs this decreases the influence they have on decisions, judgements, and perceptions. This will allow Mr. Watson to make reasonable, rational, reality based decisions regarding the processing of his legal charges. By decreasing delusional beliefs and restoring more normal thought processes,

54

> risperidone can improve the level of communication between the client and his attorney.

J.A. 369. Given the amount of detailed information contained in Lucking's report and testimony, I fail to understand how the majority can reject Lucking's analysis as "nonspecific, syllogistic reasoning."

The majority contends that its rejection of Lucking's evidence is warranted because his report and testimony failed to

> relate[] the proposed treatment plan to Watson's particular medical condition. . . . There is <u>virtually nothing</u> in Lucking's report or testimony . . . that is <u>sufficiently specific to Watson</u> that it could satisfy the government's burden of showing that Watson is substantially likely to be rendered competent by forcible medication, let alone meet the rigorous clear and convincing standard.

Majority Op. at 17-18 (emphasis added). While the majority finds the government's evidence insufficiently specific, it provides no concrete example of how the evidence is inadequate or what other information should have been presented. The closest the majority comes to actually identifying the perceived deficiencies is its suggestion that the evidence failed to connect the proposed treatment plan "not only [to Watson's] medical condition but also [to] his age and the nature and duration of his delusions." Majority Op. at 16.

As recounted above, however, the evidence in the record does <u>precisely</u> that. The government's evidence addresses the efficacy of involuntary treatment of those with the persecutory

55

form of delusional disorder, which is Watson's "medical condition." The government's evidence, particularly the Herbel Study, shows success in treating the persecutory subtype of delusional disorder and thus addresses the "nature" of Watson's delusions. The Herbel Study likewise shows success in involuntarily treated defendants whose delusions have persisted approximately as long as Watson's, thus addressing the "duration" of Watson's illness.[9]

While the majority contends that the district court did not explicitly address questions raised by Dr. Hilkey about whether Watson's "particular persecutory delusions" would respond to medication, Majority Op. at 26, a failure by the district court to address a given issue cannot be equated to a failure of proof. The evidence presented by the government provided bases for the district court to conclude, despite the questions raised by Hilkey, that the government's proposed treatment plan was substantially likely to restore Watson's competency. Given the wealth of information showing the government's consideration of

---

[9] As to age, the record shows that the government properly recorded and reported Watson's age in the relevant forms and reports. Beyond the possible connection of age to the duration of symptoms, however, there is nothing in the record suggesting that a patient's age is relevant to issues in this case. That is, nothing in the record suggests, for example, that older patients are more prone to suffer from the side effects of antipsychotics, or that patients of a particular age are more or less responsive to antipsychotic drugs.

56

Watson's specific diagnosed psychological condition as well as his physical condition, the majority's rejection of the government's evidence simply cannot be squared with our highly deferential standard of review.

B.

The majority draws support for its conclusion on Lucking's testimony at the <u>Sell</u> hearing that he would have recommended risperidone for Watson whether or not Watson had previously taken it. In the majority's view, this testimony shows that Lucking's recommendation "rested not on any individualized assessment of Watson, but on the belief that 'antipsychotics are the treatment of choice for psychotic symptoms' -- the same nonspecific, syllogistic reasoning we have previously rejected." Majority Op. at 24.

Lucking's risperidone recommendation was based on Lucking's belief that Watson had previously taken it without incident <u>and</u>, as discussed above, on an individualized assessment of the particular disorder affecting Watson, the other medications Watson was taking, and whether Watson had any underlying conditions that would cause or complicate the treatment of any side effects. Moreover, Lucking reached his recommendation by relying on studies involving treatment of patients suffering from Watson's specific disorder. Lucking's recommendation was therefore based on a consideration of Watson's particular

57

diagnosis and physical condition.  That Lucking <u>also</u> had more generalized reasons to chose risperidone[10] does not somehow negate the individualized aspects of Lucking's analysis and render it insufficient as a matter of law.

C.

The majority also suggests that the government's evidence is insufficient because the academic literature relied upon by Lucking does not "bear[] on Watson's particular medical condition or circumstances," Majority Op. at 17, and because of "weaknesses" the majority perceives in the studies that support Lucking's conclusions, <u>id.</u> at 20.  Again, I disagree.

1.

As noted by the majority, not all of the studies cited in Lucking's report specifically address the treatment of delusional disorder, and not all of those specifically addressing delusional disorder show a positive response to treatment by a majority of the patients.  Nonetheless, Lucking's report discusses several studies, including the Herbel Study, that provide clear support for the use of antipsychotic drugs in the treatment of delusional disorder generally and more

---

[10] As Lucking's report and testimony established, second-generation antipsychotics are preferred over first-generation antipsychotics because of their less-severe side-effect profile, and risperidone is the only second-generation medication that can practicably be administered involuntarily.

specifically in the treatment of the persecutory form of the disorder.[11]

While the studies that discuss the general efficacy of antipsychotics in the treatment of psychotic illnesses may not bear on Watson's particular medical condition, I am perplexed by the majority's claim that the other studies do not bear on Watson's condition. The issue in this case is whether Watson, who suffers from delusional disorder, should be involuntarily treated with antipsychotic medication. Lucking relied on literature addressing the treatment of delusional disorder with antipsychotic medication, including the Herbel Study, which

---

[11] As the majority concedes, the Herbel Study "unequivocally support[s] the involuntary use of antipsychotic medication to restore the competency of defendants with the Persecutory Type of Delusional Disorder." Majority Op. at 20-21. In addition to the Herbel Study, Lucking's report discusses a 1995 article reviewing 209 cases of delusional disorder being treated with antipsychotics, which determined that 53% of the patients fully recovered, 28% partially recovered, and 20% did not improve. While there is no indication of how many of the patients suffered from the persecutory form of the disorder, the study revealed that "[t]reatment was positive regardless of delusional content," J.A 372 (emphasis added), thus indicating that the persecutory form of the disorder is no less responsive to medication. And since the record establishes that "even a partial response to antipsychotic medication can result in a restoration of competency," J.A. 370, the study's 81% full-or-partial recovery rate clearly supports Lucking's opinion that delusional disorder can be successfully treated with antipsychotics. Lucking's report also discusses a 2006 study involving eleven patients with delusional disorder, ten of whom had a complete remission of symptoms after being treated with a first-generation antipsychotic.

studied the efficacy in the prison context of involuntary medication to restore the competency of defendants suffering from delusional disorder. The scientific literature thus directly addresses Watson's specific condition and was properly relied on by Lucking and the district court. Indeed, if these studies do not bear on Watson's particular medical condition, it seems unlikely that any academic literature short of a paper devoted entirely to the treatment of the actual defendant in question would meet the majority's unexplained standard for "bearing" on an incompetent defendant's particular medical condition.

2.

More troubling than the majority's claim that the academic literature does not bear on Watson's particular condition, however, is the majority's failure to give any weight to the supportive studies when determining the sufficiency of the evidence before the district court. The majority concedes that the Herbel Study provides unequivocal support for the government's proposed treatment plan, but it dismisses that study as "vulnerable to bias in favor of finding a positive response to treatment." Majority Op. at 21 (alteration and internal quotation marks omitted). The majority does not mention the other supportive studies, presumably because of the unidentified "weaknesses" perceived by the majority.

60

The majority's treatment of these studies, particularly its rejection of the Herbel Study, fails to respect the limited role of an appellate court applying clear-error review. The question in this case is not whether the majority itself is persuaded by Dr. Lucking and the studies he relied on, but whether there is any plausible view of the record that clearly and convincingly establishes the propriety of the proposed treatment plan. See Anderson, 470 U.S. at 573–74. And when answering that question, we are required to view the evidence in the light most favorable to the government, the prevailing party. See United States v. Antone, 742 F.3d 151, 155 n.1 (4th Cir. 2014) (reviewing district court's order finding defendant subject to indefinite civil commitment as a sexually violent predator).

As noted above, Lucking's report discussed studies that concluded that delusional disorder, including the persecutory subtype, can be successfully treated with antipsychotic medications, and he also discussed studies reaching the opposite conclusion. The district court was thus presented with conflicting evidence about the efficacy of treating delusional disorder with antipsychotic medications, a conflict that the court implicitly, but nonetheless undeniably, resolved in the government's favor. And under our standard of review, this court is obliged to defer to the district court's resolution of the conflict. See Anderson, 470 U.S. at 574 (explaining that

deference to district court's factual findings is required "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts").

Rather than treating the positive studies as evidence supporting the proposed treatment plan, however, the majority treats the conflict in the evidence as an opportunity for factfinding. The majority weighs the conflicting scientific literature and declares it "equivocal," and then rejects the equivocal evidence as insufficient to support Lucking's opinion. This approach is inconsistent with our role as a reviewing court, "for our function is not to reweigh the evidence presented to the district court." United States v. Charleston County, 365 F.3d 341, 349 (4th Cir. 2004); see Ceraso v. Motiva Enters., LLC, 326 F.3d 303, 316 (2d Cir. 2003) ("The weight of the evidence is not a ground for reversal on appeal, and the fact that there may have been evidence to support an inference contrary to that drawn by the trial court does not mean that the findings are clearly erroneous." (citation omitted)).

Moreover, the majority's specific criticism of the Herbel Study -- that it is vulnerable to bias -- provides no basis for removing the Study from the sufficiency-of-the-evidence equation. As noted above, the authors of the Herbel Study acknowledged that "[s]tandard research methods to reduce bias,

such as random assortment to assigned treatment groups, the use of a placebo control group, and blinded outcome measures, were not possible" given that the study consisted of a "retrospective inpatient chart review." J.A. 149-50. These criticisms, however, could be levelled against <u>all</u> of the studies, positive or negative, addressing the treatment of delusional disorder. As the record makes clear, delusional disorder is very rare, and there are no controlled studies of the use of antipsychotic medication to treat delusional disorder, only case studies, which yield "lower quality" evidence than do controlled studies.

Notwithstanding the limitations inherent in the limited available scientific literature, both Dr. Lucking and Dr. Hilkey relied on the available literature when reaching their conclusions. There is no evidence in the record raising any question about the propriety of that reliance, nor is there any other evidence that otherwise would permit us to reject the Herbel Study or the other studies supporting Lucking's position and exclude them from consideration when evaluating the sufficiency of the evidence.

The majority suggests that the supportive studies would be entitled to some evidentiary weight if there had been some "explanation or analysis applying their findings to Watson as an individual." Majority Op. at 21. However, all of the information necessary to apply to the findings of these studies

63

to Watson is found in Lucking's report, which makes it clear that the studies involved the use of antipsychotic medications to treat those suffering from delusional disorder, including the persecutory subtype of the disorder. Lucking's report does not use impenetrable scientific jargon when describing the studies, and the district court was thus more than capable of reading Lucking's report and drawing its own conclusions about the various studies discussed in the report. See, e.g., United States v. Bales, 813 F.2d 1289, 1293 (4th Cir. 1987) (explaining that where the district court acts as factfinder, "the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts . . . [and] may select among conflicting inferences to be drawn from the testimony"). While it perhaps would have been helpful if Lucking had explicitly testified that the studies addressed the very condition affecting Watson, his failure to do so cannot be grounds for reversal when that information was otherwise presented to the district court.

When the scientific evidence is considered along with Lucking's report and testimony and viewed in the light most favorable to the government, see Antone, 742 F.3d at 155 n.1, I believe that evidence is sufficient to support the district court's order.

D.

To the extent the majority's real complaint is that the government's evidence is not compelling enough to constitute clear and convincing evidence as a matter of law, then I again disagree.

Evidence crosses the clear and convincing threshold if it is "of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." Springer, 715 F.3d at 538 (internal quotation marks omitted).

In my view, a factfinder could reasonably find the Herbel Study more compelling and its conclusions more persuasive than the earlier studies questioning the efficacy of medication for delusional disorder. As previously noted, ten of the seventeen Herbel-Study patients restored to competency took three months or longer to respond to the medication, a period significantly longer than the medication trials involved in the earlier, more pessimistic studies. See J.A. 150 ("That 10 of the 17 patients who responded to treatment required continuous antipsychotic treatment for at least three months, and some up to five months, was unexpected. This result provides a plausible explanation for the presumed refractory nature of delusional disorder

65

symptoms."). Moreover, unlike earlier studies of voluntary treatment for delusional disorder, the Herbel Study demonstrates the efficacy of medication when the subjects are not permitted to drop out of treatment. Because the Herbel Study assessed the success of involuntary treatment administered under circumstances largely identical to those at issue in this case and provides a reasonable basis for discounting the more pessimistic conclusions of other studies, I believe a factfinder could reasonably find that the Herbel Study clearly and convincingly supports the government's position. Cf. United States v. Gillenwater, 749 F.3d 1094, 1103 (9th Cir.) (O'Connor, J.) (finding district court did not clearly err in accepting testimony of Dr. Lucking over defense expert who "relied exclusively on older studies," when Lucking "relied on more recent studies indicating that the older negative view was mistaken"), cert. denied, 135 S. Ct. 222 (2014).

Similarly, there is evidence in the record making it reasonable for the factfinder to assign significant weight to Lucking's recommendation. As noted above, Lucking testified that he had involuntarily medicated approximately ten defendants suffering from delusional disorder, all of whom were restored to competency. His personal success in treating the same disorder as Watson's, under the same circumstances that Watson would be treated, could reasonably be viewed by the

66

factfinder as strong evidence that the treatment plan proposed by the government was substantially likely to restore Watson's competency.

The majority, however, dismisses the evidence of Lucking's experience because Lucking provided no details about those patients and we therefore do not know how many of his patients suffered from the persecutory type of disorder or what type of medication was used. While more detail would be helpful, I do not believe the lack of detail somehow renders Lucking's experience irrelevant, particularly since the Herbel Study shows a high response rate for all delusional-disorder patients, including those with the persecutory subtype, and finds that the presence of delusions of governmental persecution "does not appear to be a useful predictor of nonresponse to treatment." J.A. 149. Because the factfinder would be entitled to consider Lucking's testimony in light of the other evidence presented at trial, see, e.g., Davis v. Richmond, Fredericksburg & Potomac R.R. Co., 803 F.2d 1322, 1327 (4th Cir. 1986), the findings of the Herbel Study make the lack of detail in Lucking's testimony less significant than the majority suggests. Under these circumstances, I believe it is improper for the majority to refuse to consider Lucking's testimony about his experience treating defendants with delusional disorder as part of its evaluation of the sufficiency of the evidence.

67

In my view, then, the record thus provides a plausible basis for the factfinder to slide extra weight over to the government's side of the scale and conclude that the evidence clearly and convincingly establishes the propriety of the proposed treatment plan. Although there is evidence supporting a contrary conclusion and raising questions about certain aspects of the government's proposed plan, that contrary evidence does not raise such substantial questions about the government's evidence as to render it insufficient as a matter of law, but instead simply creates questions of fact for resolution by the factfinder. See, e.g., United States v. Heyer, 740 F.3d 284, 292 (4th Cir. 2014) ("[E]valuating the credibility of experts and the value of their opinions is a function best committed to the district courts, and one to which appellate courts must defer." (internal quotation marks omitted)). I therefore disagree with the majority's conclusion that the government's evidence was insufficient to carry its burden of proof.

V.

I now turn to the merits of Watson's argument that the district court clearly erred by misinterpreting Hilkey's report and the need for supportive therapy in addition to medication.

68

A.

In its order, the district court acknowledged that while Hilkey "strongly support[ed] the use of supportive . . . psychotherapy alongside pharmacological treatments, Hilkey "did not opine in his forensic evaluation that Dr. Lucking's treatment plan will be unsuccessful." J.A. 340. Citing Lucking's report and testimony, the district court held that the proposed treatment plan was substantially likely to render Watson competent to stand trial, and the court granted the government's motion to involuntarily medicate Watson without requiring the government to provide supportive therapy.

On appeal, Watson argues that the district court erred by finding that Hilkey only <u>suggested</u> supportive therapy in addition to medication. Watson contends that Hilkey's report made it clear that medication <u>must</u> be combined with supportive therapy for the medication to succeed in restoring his competency. Watson argues that because the district court misunderstood Hilkey's report, the district court never gave proper consideration to the evidence contradicting Lucking's evidence and thus clearly erred.[12]  See, e.g., Wooden, 693 F.3d

---

[12] The majority touches on this issue in the course of identifying various deficiencies in the district court's order. According to the majority, the district court "summarily disregarded Hilkey's report in its entirety, solely because Hilkey failed to state expressly that the proposed treatment

69

at 454 (finding clear error where district court ignored substantial amount of contradictory evidence). In support of his argument, Watson points to Hilkey's statement that "any treatment approach be it pharmacological or psychological <u>must be offered in a supportive manner</u> designed to mitigate the fears of the individual being treated." J.A. 383 (emphasis added). According to Watson, this statement "unequivocal[ly]" shows Hilkey's view that "[a]ny treatment must be offered in a supportive manner. Otherwise, forcible medication just reinforces fears of persecution." Brief of Appellant at 24.

In my view, Hilkey's report is much less conclusive on this point than Watson contends. Regarding supportive therapy, Hilkey stated that "[s]upportive therapy has been shown to be an effective treatment" for delusional disorder, J.A. 382, and that "[t]he literature on treatment of persons with delusional [disorder] strongly encourages the use of supportive and

---

plan would not succeed." Majority Op. at 25. The majority contends that the district court thus failed to address Hilkey's questions about Lucking's reading of the scientific literature, Hilkey's view that "the fixed, well established nature" of Watson's delusions made them "resistant to change," J.A. 383, or Hilkey's belief that supportive therapy was required to maximize the likelihood that medication would be effective. As previously noted, however, insufficiency of the government's evidence, not inadequacy of the district court's findings, is the basis for the majority's reversal of the district court's order.

cognitive behavioral psychotherapy for the treatment of Delusional Disorder," J.A. 384. Noting that "Watson has the capacity to form a degree of therapeutic alliance should someone attempt to do so," Hilkey stated his "strongly held opinion" that such supportive therapy "<u>could</u> increase the likelihood his competency could be sufficiently restored." <u>Id.</u> (emphasis added).

While it is apparent that Hilkey thought supportive therapy was very important, the district court correctly observed that Hilkey never <u>directly</u> stated that the proposed treatment plan of medication without therapy would not work. Indeed, Hilkey's statement that supportive therapy could <u>increase</u> the likelihood of success suggests that medication alone has at least <u>some</u> likelihood of success. And the statement that Watson emphasizes -- that "any treatment approach be it <u>pharmacological or psychological</u> must be offered in a supportive manner," J.A. 383 (emphasis added) -- seems to implicitly acknowledge that there are supportive and non-supportive ways to administer <u>either</u> approach to treatment, medication <u>or</u> therapy. Under this reading, Hilkey's recommendation that medication be administered in a supportive <u>manner</u> does not amount to a statement that supportive <u>therapy</u> is required. Given the lack of clarity in Hilkey's report, I cannot find clear error in the district court's conclusion that Hilkey did not opine that medication

71

alone would not be effective to restore Watson's competency. See Anderson, 470 U.S. at 573-74 (factual findings are not clearly erroneous "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety"); id. at 579 (deferring to trial court's interpretation of ambiguous testimony).

Although I do not believe that the district court's interpretation of Hilkey's report is clearly erroneous, I nonetheless agree with Watson that the district court's findings are inadequate to show that it properly considered the entire range of evidence relating to supportive therapy. While Hilkey's report is ambiguous as to whether supportive therapy is required, the report unambiguously establishes that supportive therapy is beneficial as an adjunct to medication in that it can, inter alia, encourage compliance with the treatment plan and help mitigate the persecutory fears that might otherwise be exacerbated by the government forcibly administering the medication. Dr. Lucking made the same point in his report, noting that "there is evidence" that psychotherapy is "beneficial to an individual with psychotic symptoms . . . as an adjunctive treatment to the antipsychotic agents to improve such things as insight, compliance, or coping skills." J.A. 375.

The district court thus had before it evidence from both the government and the defense establishing that supportive

72

therapy is a beneficial addition to a medication-based treatment plan for patients suffering from delusional disorder, with no evidence raising any doubts about that conclusion. The court also had before it Dr. Hilkey's undisputed[13] opinion that including therapy in the treatment plan would increase the likelihood that the plan would succeed in restoring Watson's competency to stand trial. The district court noted Hilkey's strong preference for using therapy along with medication, but it did not acknowledge the additional benefits obtained when supportive therapy is added to a medication plan or the medication-success-enhancing nature of supportive therapy. And while the district court noted Lucking's view that therapy alone would not help Watson, the court did not explain why it determined that therapy should not be required in addition to medication.[14]

---

[13] Lucking did not affirmatively state that therapy increases the likelihood that medication will be successful, but nothing in his report or testimony contradicts or raises questions about Hilkey's view.

[14] Lucking testified that therapy alone would be ineffective because delusions respond to medication, but not therapy, and because Watson did not agree that he was mentally ill and would not participate in therapy. While using therapy as an adjunct to medication would seem to eliminate at least a portion of these concerns, Lucking did not address whether adjunctive therapy would be appropriate in this case.

In my view, the evidence of the benefits of adjunctive supportive therapy is, at the very least, relevant to the factual question of whether the government's medication-without-therapy plan was not merely likely, but "substantially likely," Sell, 539 U.S. at 181 (emphasis added), to restore Watson's competency. Given the sensitive nature of "an involuntary medication order, which trenches upon the elemental individual liberty interest in refusing the invasive administration of mind-altering medication," United States v. Chatmon, 718 F.3d 369, 376 (4th Cir. 2013), it is important for the district court to fully consider treatment options that maximize the likelihood the treatment will succeed. And in this case, where there is disagreement over the medication-success-rates in the limited available scientific literature, but agreement among the expert witnesses that adjunctive therapy can increase treatment compliance, it seems especially important for the district court to give explicit consideration to the value of adjunctive therapy. Cf. Herbel Study, J.A. 150 ("The real obstacle to positive treatment response in delusional disorder may not be the intrinsic biological features of the illness, but may instead be the difficulties in convincing these patients to adhere to an adequate trial of medication.").

While I do not suggest that the district court was required to order adjunctive supportive therapy, the court was at least

74

required to acknowledge the evidence establishing its benefits. See Chatmon, 718 F.3d at 376 ("Of course, a district court need not credit a defendant's evidence or accept his arguments, but its findings should offer some reason why it did not."); Wooden, 693 F.3d at 454 ("Although the district court might not have been required to accept that the evidence recounted above proved Wooden's ongoing pedophilia, the court was required to at least consider the evidence, and account for it, when concluding otherwise."). The district court's failure to consider relevant evidence when determining that the government's plan was substantially likely to succeed means that the court's factual finding cannot be sustained. See United States v. Francis, 686 F.3d 265, 273 (4th Cir. 2012) ("A court commits clear error when it makes findings without properly taking into account substantial evidence to the contrary." (internal quotation marks omitted)); Jiminez v. Mary Washington Coll., 57 F.3d 369, 379 (4th Cir. 1995) (explaining that district court clearly errs when it "disregard[s] substantial evidence that would militate a conclusion contrary to that reached").

B.

I turn now to the question of remedy. The majority, finding the government's evidence insufficient, reverses the district court's order without remanding for additional proceedings. As I have explained, however, the sufficiency of

75

the government's evidence is not properly before this court. Instead, the only issue properly before this court is whether the district court's factual findings are sufficient to support the court's substantially-likely-to-succeed conclusion.

When an appeal turns on an error by the district court, the proper remedy would normally be to vacate the district court's order and remand for further proceedings, so as to give the district court the opportunity to reconsider the issue; only in unusual cases would this court render judgment for a party after identifying an error by the district court. See Pullman-Standard v. Swint, 456 U.S. 273, 291-92 (1982) (noting that when a district court fails to make required factual findings, "a remand is the proper course unless the record permits only one resolution of the factual issue"); aaiPharma Inc. v. Thompson, 296 F.3d 227, 235 (4th Cir. 2002) (noting, after finding error by district court, that "[o]rdinarily, the proper course would be to vacate the district court's judgment and to remand," but concluding that "special circumstances allow us to put aside the district court's procedural error and render a decision on the merits" (emphasis added)); see generally Chatmon, 718 F.3d at 376 ("Because the district court erred in its analysis of the third Sell factor, we vacate the involuntary medication order and remand for further findings."); Wooden, 693 F.3d at 463

76

(vacating and remanding for reconsideration after identifying numerous deficiencies in district court's factual findings).

In this case, the record is not so one-sided that it renders the district court's error harmless, nor is there any other reason to bypass the usual remand route.[15]  Accordingly, because I believe that the only error in this case is the district court's failure to address the issue of adjunctive supportive therapy, I would vacate the district court's order and remand for further proceedings to permit the district court reconsider the issue and make the findings necessary to support its ultimate conclusion.

VI.

For the reasons set out above, I believe that the sufficiency of the government's evidence is not properly before

---

[15] In the majority's view, "remand is inappropriate because the record permits only one resolution of the factual issue: that this burden cannot be met."  Majority Op. at 28-29 (internal quotation marks omitted).  For the reasons previously discussed, I strongly disagree with the majority's assessment of the record.  Even if the evidence were insufficient, however, this court in such circumstances has previously remanded rather than reversed.  See Bush, 585 F.3d at 817-18 (finding government's proof deficient in several respects and "remand[ing] this issue for consideration of further evidence, if it is deemed appropriate, and findings by the court"); Evans, 404 F.3d at 242-43 (finding government's evidence insufficient to carry Sell burden and "remand[ing] with instructions for the district court to reassess the motion after affording the parties the opportunity to supplement the record in a manner consistent with this opinion").

this court and that it is improper for the majority to reverse the district court on an issue the majority has raised <u>sua sponte</u>. The majority's reversal is particularly inappropriate since the government has had no opportunity to brief the issue or defend the sufficiency of its evidence before this court. Indeed, counsel for the government will surely be surprised by the outright reversal in this case, given that the only relief sought by the appellant was the vacating and remanding for reconsideration of the district court's order. Nonetheless, even if the sufficiency of the evidence were properly before us, I believe that the evidence is more than sufficient to survive appellate review. And as to the issues actually raised by Watson,[16] I would vacate the district court's order and remand

---

[16] Watson also challenges the district court's analysis of the first <u>Sell</u> factor, which requires the government to show that important interests are at stake that are not mitigated by special circumstances. <u>See</u> <u>Sell v. United States</u>, 539 U.S. 166, 180 (2003). Watson contends that he would likely succeed in establishing an insanity defense, which would subject him to civil commitment, <u>see</u> 18 U.S.C. § 4243(a), and that the district court therefore erred by not treating that defense as a special circumstance that mitigated the government's interest in prosecution. As the district court noted, however, an insanity defense and the competency-to-stand-trial inquiry focus on different questions, and there is nothing in the record establishing or even suggesting that the delusions prevented Watson from recognizing the wrongfulness of his actions. <u>See</u> <u>United States v. Mackey</u>, 717 F.3d 569, 574 (8th Cir. 2013) ("That Mackey was delusional at the time of his arrest does not necessarily mean that he could mount a successful insanity defense."). I see no error in the district court's conclusion that the record established only the <u>possibility</u> that Watson

78

for reconsideration and additional findings by the district court on the necessity of adjunctive therapy.

Accordingly, I hereby respectfully dissent from the majority's decision to reverse the district court's order granting the government's petition to involuntarily medicate Watson.

---

would assert and ultimately succeed on an insanity defense, and that the mere possibility of establishing the defense did not substantially undermine the government's strong interest in prosecuting Watson. Cf. United States v. Evans, 404 F.3d 227, 239-40 (4th Cir. 2005) (explaining that the "unlikely future civil confinement" of the defendant does not "make unimportant the Government's interest in prosecuting [the defendant] on the serious charges against him").